Cory Lynn Abrams, Plaintiff in *propria persona*
11511 Pendleton Road
Yucaipa, CA 92399
corya8888@gmail.com; (909) 838-9342

FILED
CLERK, U.S. DISTRICT COURT

SEP 1 5 2023

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION    BY DEPUTY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### Eastern Division
George Brown Courthouse; 3470 Twelfth Street; Riverside, CA 92501-3801

NO CV30

CORY LYNN ABRAMS

    PLAINTIFF,

v.

**EDCV23-01891-JGB(KKx)**

CASE NO. _____

LOMA LINDA UNIVERSITY
MEDICAL CENTER
    DEFENDANT.

_____/

## COMPLAINT FOR DISABILITY DISCRIMINATION

    Cory Lynn Abrams ("plaintiff") sues Loma Linda University Medical Center ("defendant") for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§12181-12189 ("Title III of the ADA") as implemented under 28 CFR Part 36 (36.101 *et sequitur*) for discrimination and retaliation on the basis of disability; for prohibited actions taken on the basis of this disability under the "regarded as" prong and the "record of" prong; and for declaratory and injunctive relief under Title III of the Americans with Disabilities Act as implemented under 28 CFR Part 36, *et sequitur.*

### PARTIES

**1.**    Plaintiff resides in Yucaipa, California at the address of 11511 Pendleton Road for all times material to the facts giving rise to the complaint.

**2.**    At all times material to this action, plaintiff was an "invitee" of defendant within the meaning of the ADA.

3.      Defendant is a "public entity" within the definition of 28 CFR Part 35.104, with its principal place of business at 11370 Anderson Street, suite 3000 and 11234 Anderson Street; Loma Linda, CA 92354 for all times material to the facts giving rise to the complaint.

4.      At all times relevant, defendant was a "covered entity" as defined by 42 U.S.C. §§12181-12189.

## JURISDICTION AND VENUE

5.      This court has original and exclusive jurisdiction over plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1345, in that the matters in controversy are brought pursuant to Title III of the ADA. This Court has authority to grant a declaratory judgment pursuant to 28 U.S.C. §§2201 and 2202 and authority to grant equitable relief, monetary damages, and civil penalties under 42 U.S.C. § 12188 as implemented under 28 CFR Part 36 (36.101 *et sequitur*).

6.      Venue is proper in this judicial district under 28 U.S.C. §1391 because defendant does business in this judicial district and the acts complained of took place in this judicial district.

## PLAIN STATEMENT

7.      Defendant denied the plaintiff equal access to its facilities when she sought medical care involving the birth of her child in March of 2021. Defendant refused to provide the medical care for no other reason than plaintiff's refusal to submit to unrelated medical treatments as a condition for receiving the medical care she original sought.

## STATEMENTS OF FACT

8.      On March 22, 2021, plaintiff arrived at the entrance of defendant's Loma Linda University Medical Center ("LLUMC") Faculty Medical Offices ("FMO") building for her first prenatal appointment with Dr. Stewart Barlow.

9.      Plaintiff was prevented from entering the building by two women, acting for the defendant, who began harassing her, asking for medical information unrelated to her pregnancy, putting a thermometer on her forehead, and telling her she must wear a surgical

mask, which were all treatments and tests they claimed would prevent the spread of a "deadly contagious disease" (disability) that plaintiff did not require treatment for.

10.   Plaintiff explained that she was pregnant, very ill with *Hyperemesis Gravidarum* (severe nausea and vomiting during pregnancy), had not been diagnosed with a contagious disease, and she had a very difficult time breathing with the surgical mask.

11.   Plaintiff was told there were no exceptions and per the hospital "COVID policy", she would not be allowed in without complying with these conditions.

12.   The defendant's "COVID policy" included nearly verbatim copies of those published by the Centers for Disease Control and Prevention ("CDC"), and the California Department of Health ("CDPH"), yet were not imposed upon anyone, including the plaintiff, by any court order or any law.

13.   Defendant's "COVID policy" failed to include any provision for those with disabilities, and failed to identify any employee or designated individual who was responsible for responding to complaints for violations of the Americans with Disabilities Act.

14.   Plaintiff was forced to comply in order to receive medical care.

15.   When plaintiff was in the room with Dr. Barlow, she removed the mask completely and explained that she felt extreme shortness of breath with it on, and that it increased her nausea.

16.   Dr. Barlow told her that while the mask was an inconvenience, it was for everyone's "safety", yet he failed to describe the medical necessity or medical efficacy of wearing a surgical mask, and he failed to provide any information that would allow the plaintiff to become informed as to the medical necessity or efficacy of participating in such a medical intervention.

17.   On July 12, 2021, plaintiff arrived at the entrance of the FMO building, attempting to attend her second prenatal appointment when she, her husband, and her one-year-old son were denied entry by two women, acting for the defendant. They began harassing plaintiff by imposing treatments and tests they claimed would prevent the spread of a "deadly contagious disease" (disability) that plaintiff did not require treatment for such as asking her

for medical information unrelated to her pregnancy, putting a thermometer on her forehead, and telling her she must wear a medical face mask to gain admittance.

18.      Plaintiff explained that, while she had not been diagnosed with a contagious disease and was not seeking treatment for one,  she had medical reasons which made her unable to wear the mask and that it was not healthy for her or her unborn child. Plaintiff also asked to speak to a manager.

19.      The manager, David Philips, arrived and said that plaintiff and her family could not come into the hospital without all three of them wearing a mask, and there was "nothing he could do", as the hospital was "required" to follow the CDPH mandates.

20.      Plaintiff told Mr. Philips that it appeared he was regarding her as a "direct threat" with a contagious disease without any objective evidence.

21.      Mr. Phillips became aggressive when plaintiff claimed valid exclusion to the "COVID policy" and plaintiff's husband called the San Bernardino County Sheriff.

22.      Sheriff Tristan took a report and told plaintiff and her family that there was nothing he could do to make the hospital allow plaintiff inside.

23.      Plaintiff asked Mr. Philips, in the presence of the Sheriff, to please tell her what law she was breaking by not wearing a mask, but Mr. Philips did not answer.

24.      Plaintiff stated that she wanted to document the discrimination she, and her family, were experiencing and she asked Mr. Philips to sign a "Notice of Discrimination" she was using to document the refusal of service.

25.      Plaintiff specifically asked Mr. Phillips to acknowledge that plaintiff had given a medical reason for not wearing the mask and yet he still refused to allow her entry because he considered her a "direct threat" of contagion. Mr. Phillips refused to sign the form.

26.      Plaintiff was not allowed to attend her appointment.

27.      On July 26, 2021, plaintiff wrote a letter to Dr. Barlow via defendant's MyChart Patient Portal to explain she was unable to attend her last appointment or receive medical care on July 12th due to LLUMC refusing to provide her access even when she gave a medical reason for not being able to wear a mask and she told Mr. Philips that she was not seeking

treatment for a contagious disease nor was there any evidence that she was a direct threat of infection.

28.    On that same date, she filed a complaint over the phone with Jasmine Peck from LLUMC Clinic Patient Relations.

29.    On July 27, 2021, plaintiff received a voicemail from Diana Borquez, Licensed Vocational Nurse ("LVN") in Dr. Barlow's office, stating if she did not comply with the mask policy, then LLUMC would refuse to give her medical care, and Diana Borquez did not acknowledge plaintiff's valid reasons for opting out of the "COVID policy".

30.    On that same date, Dr. Barlow responded to plaintiff's MyChart message, stating that he would not authorize her opt-out of the "COVID policy" treatments and that he was forwarding her complaint to Patient Relations.

31.    On that same date, Jasmine Peck, Clinic Patient Relations Coordinator called plaintiff on the phone, and tried to impose a new treatment on the plaintiff for the undiagnosed condition of being a direct threat of contagion. Peck suggested that plaintiff could be treated by wearing a medical face shield instead of a medical mask.

32.    Plaintiff reiterated that she did not require treatment for an undiagnosed condition. Ms. Peck still refused entry to the plaintiff and the plaintiff felt compelled to reveal further private medical information. Plaintiff explained that she was born with a medical condition that affects her right eye and due to this, and her pregnant state, she was concerned about tripping hazards related to visual impairment and declined to wear a face shield due to her concerns.  Ms. Peck refused to accept this valid reason.

33.    On July 30, 2021, plaintiff had a phone call with Dr. Barlow to discuss her difficulty wearing anything that restricted her breathing. Dr. Barlow acknowledged that plaintiff's pre-existing heart condition could cause her to feel shortness of breath. Plaintiff asked him about possibly referring her to a home health nurse as her nausea and vomiting was so severe, and she felt too ill to leave her home most of the time.

34.    On August 13, 2021, plaintiff wrote a letter to Dr. Barlow via MyChart and asked if there would be any changes to her standard of care during her C-section surgery if she

refused "COVID testing" for herself and her baby. Dr. Barlow responded that LLUMC would isolate her and that her husband would not be allowed to attend the birth.

**35.** On August 20, 2021, plaintiff made a complaint over the phone with her health insurer Anthem Blue Cross. A nurse from the Anthem 'Future Moms' Program plaintiff was participating in, attempted to call Dr. Barlow's office on her behalf. The nurse was told by Dr. Barlow's staff that plaintiff needed to comply with the "COVID policy" or else she would not be treated.

**36.** On August 25, 2021, plaintiff called the Hospital Patient Relations and spoke to a woman called Vinnia. Plaintiff explained that she did not require treatment for an undiagnosed condition and that the treatment protocols of the "COVID policy" were contrainicated by her actual medical condition. Vinnia responded that no exceptions were allowed for any reason and plaintiff would first need to comply with the "COVID policy" treatments in order to receive the treatment she sought.

**37.** On September 6, 2021, plaintiff filed a civil rights complaint online with the Civil Rights Division of the Department of Fair and Equal Housing against Mr. Phillips, Dr. Barlow, and LLUMC.

**38.** On September 20, 2021, plaintiff sent a letter to Dr. Barlow, Mr. Philips, Kent Hansen (an LLUMC Agent for Service) and several hospital administrators that detailed her reasons for not wearing a mask and face shield, she also listed public health laws that LLUMC was ignoring by refusing her care without first accepting medical procedures and medical devices that were not needed as a pre-condition of receiving requested medical care.

**39.** On September 24, 2021, plaintiff received a notice of Termination of Care on the MyChart Patient Portal as well as a certified copy of the letter via mail, signed by Dr. Barlow and Courtney Martins (Medical Director of Maternity Services) stating that defendant and Dr. Barlow were terminating their Physician/Patient relationship, and her C-section was canceled.

**40.** Dr. Barlow stated that there were significant philosophical differences in their views of medical care and treatment and that, despite the hospital providing her with various

treatments related to "COVID-19" guidelines and standards, plaintiff made it clear she would not comply.

**41.**     On September 28, 2021, plaintiff sent a letter in response to the Termination of Care letter via the MyChart Patient Portal stating this termination so late in her pregnancy was Patient Abandonment.

**42.**     On October 22, 2021, plaintiff arrived at the entrance of LLUMC with her husband acting as her patient advocate.

**43.**     They were stopped at the check-in desk and harassed with mitigation measures they never asked for i.e. to wear a face mask.

**44.**     They both refused the mitigation measures and the hospital security team was called.

**45.**     The head security officer Ana Zuniga was very aggressive and rude to plaintiff and her husband, repeatedly asking why they could not wear masks, even though she was told the reason several times.

**46.**     Plaintiff was having contractions and a rapid response team was called to asses her.

**47.**     Plaintiff was then told she would be allowed into the hospital without a mask, however they began threatening her with isolation.

**48.**     Plaintiff's husband was told he did not have the same patient rights as plaintiff, and that he would not be allowed to attend the birth without a mask, despite his being identified as the plaintiff's advocate.

**49.**     He was also informed he would need to submit to a "COVID test" if he wanted to stay with her at the hospital.

**50.**     The assessment team was demanding medical exams and mitigation measures that were not required in order for plaintiff to receive medical care for her labor contractions due to her advanced pregnancy with known complications and scheduled delivery by surgery.

**51.**     When plaintiff and her husband arrived to the waiting room, the Labor and Delivery Team Lead Nurse Jessica, told them LLUMC could keep the parents from their child if they refused to comply with the "COVID policy".

52.    Plaintiff's husband informed defendant's representative that this was coercion and retaliation.

53.    As they were waiting for a room, the Charge Nurse Carmen walked up to them and began yelling in close proximity to their faces.

54.    Plaintiff's husband was trying to explain that he was having trouble breathing in the mask and she yelled that she did not care and ordered him to put the mask on.

55.    The Charge Nurse Carmen called the Sheriff on plaintiff's husband and patient advocate and ordered a citizen's arrest, claiming that he was threatening her.

56.    Plaintiff was lying in her room, in a state of labor and she was both nude and vomiting when a San Bernardino County Sheriff Officer Maldonado-Flores, walked into her room without knocking. Plaintiff's husband told the Sheriff to wait outside and that he should have knocked first and asked permission before entering. Plaintiff's husband went outside the room to speak with the Sheriff and the Sheriff told plaintiff's husband that if he did not leave the hospital immediately, he would be charged with trespassing and served a warrant for a citizen's arrest.

57.    Plaintiff's husband asked to speak to the Watch Commander and he was again told by the Sheriff that he would be arrested and removed in handcuffs if he did not leave immediately.

58.    Plaintiff's husband was then escorted out of the hospital building by two sheriffs and was told that he was "banned for life" from the hospital.

59.    Shortly after plaintiff's husband was removed from the hospital, plaintiff was prepared for surgery.

60.    Plaintiff continued to be very ill during the surgery prep. She was given medication to try and stop her vomiting so that the anesthesiologist could administer an epidural, however it was not effective, and she continued to vomit through the epidural process.

61.    Plaintiff was clearly medically unable to wear anything over her face during labor. Plaintiff's daughter was born that evening.

62.    When plaintiff was taken to her room for recovery, she was told that she was being isolated because she refused to take a "COVID test".

63.    Plaintiff was isolated by the defendant as if she had actually been diagnosed as contagious with a "deadly contagious disease" despite there being no objective evidence to support this conclusion or treatment.

64.    She was not allowed to leave the room for any reason. Cleaning staff was not allowed to enter the room and the trash cans were overflowing onto the floor with medical waste, food trays and bathroom trash. Plaintiff did not receive the same level of care and cleanliness afforded to other patients.

65.    Plaintiff was not allowed any visitors besides her mother, who was forced to comply with the same isolation policies as her.

66.    Plaintiff's new-born daughter had an alarm that was placed on her foot that would sound if it became loose or if plaintiff were to leave the room with her.

67.    Plaintiff was retaliated against by LLUMC because she did not comply with the hospital's "COVID policy".

68.    Plaintiff was forced to be isolated from her husband and patient advocate during her child birth, and she was falsely imprisoned in her hospital room.

69.    As alleged before, plaintiff was treated as though she had a contagious disease without proof and because of this she believes she received a low standard of care.

70.    Plaintiff was discharged and as she was leaving her room, her nurse told her to wear a mask. Plaintiff did not want to wear a mask, but she felt threatened and she did not want anything to get in her way of leaving the hospital with her daughter as soon as possible.

71.    The retaliation by LLUMC extended beyond the hospital. Defendant made a report to Child Protective Services ("CPS") claiming that plaintiff had abused or neglected her child. Subsequently, CPS visited her home several times, leaving business cards with notes to call back "immediately", as well as calling repeatedly and leaving harassing voicemail messages.

**72.**    All written communications and other mentioned documents are attached to this complaint and marked as Exhibit A.

## LEGAL STANDARDS

**73.**    **Prohibition of discrimination on the basis of disability.** Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any private entity who owns, leases (or leases to), or operates a place of public accommodation. *28 CFR. § 36.201.*

**74.**    **Prohibition of retaliation on the basis of disability.** Title III of the ADA provides that "[n]o private or public entity shall coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by the Act or this part". *28 CFR. § 36.206 (b).*

**75.**    Congress stated in 2008 that the main focus of the courts should be whether the employer is satisfying its obligations under the ADA. "...[I]t is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." The standards in *Bell v. Twombly* and *Ashcroft v. Iqbal* cannot be applied without consideration of Congressional intent for the ADA, especially since Congress had to amend the law in 2008 because this very Court had made decisions that countermanded the original intent of Congress and the law.

**76.**    The court is required to review  defendant's response to determine if it makes a cognizable defense under the ADA, and not solely to analyze the complaint to determine if it meets the pleading standards in *Bell* or *Ashcroft.* The only cognizable responses available to defendant include whether or not it conducted any individualized assessment and determined that plaintiff was a direct threat, or that plaintiff's refusal to participate in defendant's "COVID policy" had created an actual undue financial burden upon defendant,

or that plaintiff refusal did in fact fundamentally alter defendant's normal business operations.

**77.**     One additional defense under the ADA includes the argument, based upon supporting facts, that the disability, in this case a "regarded as" disability as perceived by defendant, is both "transitory" and "minor". However defendant failed to perform a risk assessment and cannot avail itself of this defense to establish the "transitory" condition, and its actions preclude the "minor" criteria.

**78.**     The court is advised that denying that plaintiff had a disability is not a legal defense cognizable under the ADA.

**79.**     The court is further advised that citing a policy provision or "guideline" does not countermand any provision of the ADA, a federal law enacted by Congress and is therefore, not a cognizable legal defense. Laws do not conflict with each other, and defendant's conduct was without any legal authority or duty.

**80.**     The court is further advised that, claiming there is a "pandemic" does not constitute any cognizable defense for the alleged violations of the ADA.  Even if such a condition was proven to exist, it would not constitute a defense for defendant's disability discrimination and retaliation.

## ARGUMENT

### COUNT I. DEFENDANT DISCRIMINATED PLAINTIFF ON THE BASIS OF DISABILITY

**81.**     Defendant is a place of public accommodation.

**82.**     Defendant began adopting policies known collectively as its "COVID policy" which included purported requirements that patients such as plaintiff submit to unrelated medical treatments and examinations such as wearing surgical masks, disclosing unrelated medical records, and submitting to "COVID tests" as a condition of entering the defendant's facility and obtaining treatment for the obvious medical condition of pregnancy.

**83.**     Plaintiff is regarded as having a disability and had given the defendant notice that she was regarded as having a disability.[1] (See *Aff*. ¶¶ 18, 20)

---

1    28 CFR Part 36.105(f)

**84.**    Plaintiff was not required to disclose the identity of anyone regarding her as having a disability.

**85.**    It is not relevant whether or not defendant regarded plaintiff as having a disability.

**86.**    Plaintiff never requested any accommodation or modification to defendant's "COVID policy", nor was she required to make any such request.

**87.**    Plaintiff is not challenging defendant's failure to provide reasonable modifications under *28 CFR Part 36.302*. Likewise, it is generally unnecessary to proceed under the "actual disability" or "record of" prongs, which require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. In these cases, the evaluation of coverage can be made solely under the "regarded as" prong of the definition of "disability," which does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment.

**88.**    Defendant's denial of regarding plaintiff as having a disability is not relevant and does not constitute a legal defense that is cognizable under the ADA.

**89.**    Plaintiff was denied services and was denied equal access to services offered by defendant. (See *Aff*. ¶¶ 12, 13, 16, 18, 28, 33, 35-47)

**90.**    Upon invoking her rights under the ADA by giving notice that she was regarded as having a disability, plaintiff exercise her rights to refuse unrelated medical treatments, to informed consent and to medical privacy, each of which are squarely rooted in Title III of the ADA as implemented under *28 CFR Parts 36.105(b)(1)* and *c(1)*.

**91.**    Defendant's "COVID policy" was disproportionately applied to those with disabilities and then the group of people without disabilities, and then completely ignored those within the protected class of individuals having given notice of being regarded as having a disability within the meaning of the ADA.

**92.**    Defendant admits that its "COVID policy" was intended to "prevent the spread of COVID-19" and the policy itself demonstrates that defendant both regarded and mis-classified plaintiff as a direct threat of contagious disease (disability[2]). (See *Aff*. ¶ 12)

---

2.  28 CFR Part 36.105(e)(1)

**93.**     Defendant denied plaintiff equal access to its programs, services and benefits in
violation of Title III of the ADA.

**94.**     Defendant admits that its "COVID policy" is intended to prevent the spread of
"COVID-19", which it describes as a deadly, contagious disease; however, defendant failed
to conduct any individualized assessment of the plaintiff to determine if she was infected
with any contagious disease or disability, yet sought to impose its "COVID policy" upon her
as if she had such a disability and without her consent. Plaintiff made defendant aware of
this fact. (See *Aff.* ¶ 18)

**95.**     Defendant's "COVID policy" was based upon the pure speculation and hypothetical
belief that plaintiff had a deadly contagious disease even though defendant disingenuously
denies this.

**96.**     While defendant's "COVID policy"'s stated purpose is to "prevent the spread of
COVID-19", it has no mechanism by which to measure prevention results, and on its face,
assumes that the treatments in the policy have little or no medical efficacy unless everyone
submits to them, and continues to submit to them with no end-date. This is the very
definition of a policy which has no medical necessity or medical efficacy. At no time in
human history has it ever been established, by any scientific finding, that in order for one
person to be protected from a contagious disease, that another person has to submit to a
medical treatment. There has never been any science establishing that two people are
required to make a medical treatment effective, and if this were true, then the medical
treatment would, by definition, not be effective.

**97.**     The policy rests on the hypothetical speculation that every invitee, plaintiff included,
has or could have this disease. That is, the policy's underlying assumption is that all of its
patients and visitors are simultaneously at risk and pose a risk to the health of all other
visitors, without the evidence of any *bona fide* medical diagnosis. Medical professionals
should know better.

**98.**     No provisions of defendant's policy are intended to establish through individualized
assessment whether a particular invitee poses any direct threat to the health of the rest of
defendant's invitees; instead, it is based upon the ridiculous assumption that everyone has
such a disease.

**99.**     Defendant's "COVID policy" universally imposed these measures upon invitees, employees and patrons without considering the individualized medical assessment of each invitee's health or whether the policies were appropriate for any specific individual.

**100.**     Likewise, no provisions are in place which authorize or impose the policy measures either by legal duty or by statute, thus defendant's adoption of this policy is voluntary.

**101.**     In the rush to implement the policy no oversight was given to provide the policy with any legal enforcement mechanism.

**102.**     The policy thus relies upon the voluntary compliance of patients and invitees waiving their rights to informed consent, to medical privacy, to refuse experimental medical treatments and to refuse non-required medical inquiries or treatments.

**103.**     It should also be noted that defendant's "COVID policy" was disproportionately applied against patrons who did not volunteer to waive their rights and who claimed their medical privacy rights.

**104.**     The policy thus failed to acknowledge individuals who claimed their rights under disability law and therefore were not subject to the policy or to the same requirements as the rest of the invitees. Once again, defendant's "COVID policy" made no provisions for those with disabilities.

**105.**     Defendant's "COVID policy" failed to include or offer any reasonable modifications to its "COVID policy" that would be cognizable under Title III of the ADA, specifically, *28 CFR Part 36.302*. (See *Aff*. ¶¶ 13, 25, 25, 28, 36, 41, 42, 44, 46)

**106.**     The policy also asked representatives of defendant to make repeated, non-required-related medical inquiries of patrons and to impose unreasonable medical treatments on them, such as mask-wearing and testing. (See *Aff*. ¶¶ 12, 13, 15-17, 25, 37, 45, 46)

**107.**     The policy, as mentioned previously, lacked enforceability, and rather than allow patrons to make their own medical decisions, defendant chose to adopt and implement its "COVID policy" through obfuscation, coercion, retaliation and interference specifically towards the "unvaccinated" patrons, such as plaintiff. (See *Aff*. ¶¶ 13, 16, 19, 20, 23, 25, 28, 33, 35-39, 41-47)

**108.**    When plaintiff exercised her right under the ADA to refuse the medical treatments imposed by the "COVID policy" and gave notice that the policy discriminated against her by perceiving her as having an un-diagnosed disability, defendant denied her equal access to its programs, services and benefits and continued to impose these medical procedures that were unrelated to any medical condition of plaintiff's.

**109.**    Defendant also retaliated against plaintiff by interfering with her rights, imposing punitive measures including denying her services and benefits plaintiff had already paid for and barring her from receiving any of defendant's services, forever. These penalties were imposed as a direct and proximate cause of plaintiff's good faith refusal to participate in the defendant's "COVID policy".

## A. PLAINTIFF IS DISABLED WITHIN THE MEANING OF THE ADA.

**110.**    It should be noted that the ADA directs courts to construe "disability" in "favor of broad coverage of individuals" to the "maximum extent permitted by the terms" of the statute. *28 CFR §36.105(2)(i)*. Accordingly, courts have noted that the bar to be considered "disabled" under the ADA is not a high one.

**111.**    Defendant's "COVID policy" openly claims that it is intended to "prevent the spread of COVID-19", which it claims is a deadly contagious disease, and then outrageously, acts as if everyone is infected with it, and if everyone must submit to the same exact medical treatments without any professional examination, diagnosis, supervision, or judicial approval or oversight.

### (1) Defendant's perception of plaintiff having disability.

**112.**    Based on its "COVID policy", defendant's perception was that plaintiff actually had a contagious disease or else, a compromised immune system that made her prone to contracting a contagious disease. Denying this is not relevant and not a defense. The fact that plaintiff was regarded as having a disability and so advised defendant imposed a legal duty upon defendant to comply with the ADA, whether or not it admitted or denied regarding plaintiff as having a disability.

**113.**    The mere perception that plaintiff had a compromised immune system (independently if plaintiff was infected with a contagious disease) was sufficient for defendant to consider

that plaintiff has an impairment that substantially limited her ability to attend her medical appointments and receive care as she was giving birth, a major life activity. Defendant imposed this condition upon plaintiff without conducting an individualized assessment to objectively determine whether she was, in fact, a direct threat.

**114.**  At all times material to this action, defendant failed to comply with its duty under Title III of the ADA once plaintiff validly notified defendant of plaintiff being regarded as disabled and substantially limited and requested equal participation and access under the ADA.

**115.**  Plaintiff advised defendant that she was perceived by defendant's policies and procedures as being disabled with a contagious disease and substantially limited by an impaired immune system and an impaired respiratory system to such an extent that defendant refused to allow plaintiff to participate in and have access to, at the time of the incident and in the future, all goods and services unless plaintiff used mitigation measures.

**(2) Failure to conduct an individualized assessment.**

**116.**  Upon receiving notice of plaintiff's disability, defendant made no attempt to perform the required individualized assessment that is required prior to treating the plaintiff as a direct threat.

**117.**  Defendant ignored the requirement and continued to demand that the plaintiff participate in its "health control measures" such as mask-wearing, medical examinations, inquiries and treatments which are all under Emergency Use Authorization ("EUA") period and may be refused.

**118.**  Defendant simply denied that plaintiff was regarded as having a disability, without any assessment of any kind, and then denied that plaintiff was a qualified individual with a disability, again, without any assessment of any kind.

**(3) Failure to include provisions for invitee's with disabilities.**

**119.**  Moreover, defendant's policy, which does in fact demonstrate that it certainly did regard the plaintiff as having "COVID-19", a disability that is covered by the ADA, illegally failed to include any provision for those with disabilities.

**120.**  The policy failed to provide any advice or instruction on how to conduct any individualized assessment for those invitees claiming rights under the ADA, and failed to

- 16 -

identify any ADA representative of the defendant. In fact, the defendant's "COVID policy" completely ignored its legal duties to aid and encourage those with disabilities under the ADA.

## B. DEFENDANT IS A PLACE OF PUBLIC ACCOMMODATION

**121.**   Defendant is a covered entity and place of public accommodation.

## C. DEFENDANT IMPOSED UNRELATED MEDICAL TREATMENTS ON PLAINTIFF AS A CONDITION TO RECEIVE REQUIRED MEDICAL CARE

**(1) Denial of services on the basis of disability discrimination.**

**122.**   Defendant discriminated and retaliated against plaintiff for making a complaint that she was being regarded as disabled, thus asserting her entitlement to equal participation and access under the ADA.

**123.**   Upon advising defendant that plaintiff was regarded as having a disability; that she was a qualified individual with a disability; and she was not subject to defendant's "COVID policy" under *28 CFR Part 35.130(e)(1)*, plaintiff exercised her right to refuse the offered medical treatment of wearing a surgical mask.

**124.**   Defendant stated that the purpose and intent of the policy was to "prevent the spread of COVID-19" and this policy was predicated on the false and unproven presumption and all patients and invitees of the defendant had "COVID-19".

**125.**   Defendant informed plaintiff that the policy was a condition of being allowed inside the hospital's premises to receive medical care.

**126.**   Defendant denied plaintiff equal access to its programs, services and benefits based upon disability in violation of *28 CFR Part 35.130(a)*.

**127.**   Defendant employed its policies and procedures to harass, limit, classify, deny plaintiff equal access to the services it made available to other patients without disabilities.

**128.**   Defendant's "COVID policy" classified plaintiff as "substantially impaired" such that defendant would not permit plaintiff equal access and medical care without first submitting to defendant's "mitigation measures".

- 17 -

**129.** However, plaintiff duly noticed the defendant of her good faith opposition to defendant's discriminatory policies and procedures. (See *Aff*. ¶¶ 13, 14, 17, 20-22, 25, 29-32, 34)

**130.** Plaintiff is not required to accept or participate in medical treatments, especially those not related to any medical care she required; nevertheless, defendant used harassment as a technique to impose "mitigation measures", to treat her for a disease or disability she did not have and upon her for a perceived and unproven disability, even after plaintiff clearly stated she was excluded from the policy due to invoking her rights under the ADA.

**131.** Defendant's policy and procedures interfered with plaintiff's right to invoke ADA protections by refusing to recognize that plaintiff is entitled to claim exclusion under Federal law to the policy and procedures.

**132.** Defendant failed or refused to satisfy its legal duties under the ADA to aid and encourage those with disabilities, specifically, in response to plaintiff giving notice that she was regarded as having a disability.

**133.** Instead, defendant proceeded to mis-classify plaintiff as having a disability, the cure or treatment for which was its "COVID policy".

**(2) Plaintiff was protected under the ADA.**

**134.** Title III of the ADA also protects individuals such as plaintiff for whom submitting to certain measures would create impairments.

**135.** In this case, plaintiff had informed defendant's representatives that she had a medical condition that prevented her from wearing a mask or a face shield. (See *Aff*. ¶¶ 13, 14, 17, 20, 25, 32)

**136.** Defendant's refusal to honor plaintiff's legal exclusion from the policy of using medical devices for mitigation measures (masks) creates impairments for plaintiff that she never had to ameliorate prior to defendant regarding her as disabled with a contagious disease.

**137.** The fact that defendant claims to have applied its "mask-wearing" policy to everyone equally, fails to recognize the fact that plaintiff, after giving notice of having a disability, was within a protected class and engaged in a protected activity and therefore, not subject to the

same "COVID policy". This is the same as in the example of defendant requiring a wheelchair bound veteran to use the stairs or face denial of care by the analogy: *Everyone was required to use the stairs and the policy is applied equally to everyone*, is the erroneous conclusion here.

**138.**    As well, under Title III of the ADA, the defendant, a public accommodation, may not require plaintiff, an individual with a disability, who gave notice of being regarded as having a disability,  and who was mis-classified by defendant as having a disability, to accept medical treatments being imposed in the guise of "accommodations" which the plaintiff chose not to accept, without violating *28 CFR 36.203(c)(1)*.

**(3) Defendant failed to obtain exclusion from its legal duties under the ADA**

**139.**    ADA compliance requires defendant to either provide equal access and participation or to claim and prove an exemption to Title III of the ADA; defendant did neither and thus failed to maintain compliance with Title III of the ADA.

**140.**    Defendant failed to identify or describe any set of facts establishing that plaintiff's good faith refusal to participate in defendant's "COVID policy" would have created any undue financial hardship.

**141.**    Defendant failed to identify or describe any set of facts establishing that the disability its "COVID policy" was intended to prevent was both transitory and minor.  No such facts could ever be established because defendant had no medical diagnosis of plaintiff and failed to conduct any individualized assessment.

145.    Not only is defendant's "COVID policy" irrational, it also is based on the implausible scenario that everyone, including plaintiff, had a deadly contagious disease, which that defendant assumes it could treat without permission, without any medical diagnosis and without any means of measuring the results to determine if its treatments were effective.

146.  Defendant's policy is based upon the purely speculative and hypothetical belief that everyone suddenly incurred the same disability and that magically, defendant had the treatment and could impose it upon everyone without any medical examination, informed consent, medical privacy, diagnosis or professional or judicial oversight.

146.   The policy was not implemented with any legal authority or duty whatsoever, there is no rational basis to act as if every single patron suddenly had the same exact illness (disability) and that without any examination, everyone would benefit from the same exact medical treatment and that non-skilled and unlicensed individuals should impose such interventions upon everyone at the same time because of some commentary on a website (e.g. the CDC) that says it is a good idea, while such websites simultaneously disclaim such commentary as having any legal or medical accuracy.

142.   Defendant had no financial responsibility, either to protect anyone from any deadly contagious disease, or to compensate anyone suffering any adverse health consequences from participating in its "COVID policy".

143.   This practice, regarding oneself and others as having an illness without any diagnosis, and then seeking to treat everyone with the same medical intervention without any diagnosis, is defined as a mental illness in the Fifth Edition of the Diagnostic and Statistical Manual for Mental Health.

144.   Defendant's "COVID policy" demonstrates that those seeking to impose it upon invitees such as plaintiff are suffering from an un-diagnosed mental illness and have demonstrated that each of them are a danger to themselves and others and must be ordered to submit to an involuntary mental evaluation.

**COUNT II. DEFENDANT RETALIATED PLAINTIFF ON THE BASIS OF DISABILITY**

**A. Plaintiff was engaged in protected activity.**

145.   Upon giving defendant notice that she was regarded as having a disability and that she was a qualified individual with a disability, plaintiff became protected under the ADA.

146.   Defendant discriminated and retaliated against plaintiff for making a complaint that she was being regarded as disabled, thus asserting her entitlement to equal participation and access under the ADA.

147.   Despite having knowledge of plaintiff claiming protected status under the ADA, defendant has discriminated and continues to discriminate against plaintiff, an individual with disabilities, on the basis of disability in the full and equal enjoyment of its goods, services, facilities, privileges, advantages, and accommodations, *42 U.S.C. §12182(a)*.

**B. Plaintiff was subjected to adverse actions.**

**148.**    Defendant began retaliating against plaintiff by imposing punitive measures upon her for her good faith refusal to participate in defendant's offered medical treatments imposed under the guise of "accommodations" to perceived disability as previously alleged.

**149.**    Defendant refused to allow plaintiff to attend her prenatal appointments; terminated the patient/physician relationship without cause; isolated her while she was in labor by preventing her husband from attending the birth of their daughter; used law enforcement agents to remove her husband from the premises; performed illegal drug tests on plaintiff and her newborn daughter; and falsely reported her to Child Protection Services.

**150.**    Defendant's responded to the requests made by plaintiff to cease the discrimination and harassment by being non-responsive, dismissive or harassing.

**151.**    Defendant began unceasingly retaliating against plaintiff despite her reasonable good faith belief that she was exercising protected opposition to discriminatory activities and claiming rights protected under the ADA.

**152.**    The injury suffered by plaintiff is thereby concrete and particularized and it is actual and imminent.

**153.**    The injury alleged in the complaint, including the pleading and affidavit clearly sets forth a set of facts that actually occurred and are not conjectural or hypothetical. The injury described therein is traceable to the challenged action, conduct and policies of the defendant.

**154.**    The harm (injury) already suffered by the plaintiff includes, but is not limited to, having to choose between waiving rights to: medical privacy, informed consent, refusal to take part in clinical trials, and to be free of discrimination and retaliation OR being refused dignified medical care. Once violated, these rights cannot be recovered.

**155.**    As a result of defendant's actions, plaintiff has experienced retaliation, coercion, and interference with her rights which are violations of *28 CFR 36.206 (a)(b) and (c)*.

**156.**    As a result of defendant's intentional, willful and unlawful acts by interfering with her rights under the ADA, plaintiff has suffered injury and damages.

**157.**     Defendant retaliated against plaintiff by interfering with the exercise or enjoyment of rights granted or protected by ADA of 1990 and the ADA-AA of 2008, specifically *28 CFR Part 36.206(c)*.

**C. There is a causal connection between the plaintiff's assertion of her rights and the retaliation.**

**158.**     Each time plaintiff exercised her right to refuse treatment, defendant undertook retaliatory actions against her and in each instance, such measures were causally related to the incident of denying plaintiff equal access as alleged.

**159.**     Defendant focused its efforts on punishing plaintiff for claiming her rights and for opposing a discriminatory policy; rather than on providing equal access and participation, per defendant's duty.

**160.**     Defendant has established a pattern of practicing retaliation against plaintiff which is not objectively or subjectively in good faith, therefore plaintiff is entitled to liquidated damages or other monetary damages, including punitive damages to the extent available.

**161.**     Plaintiff demands a jury trial.

**162.**     **WHEREFORE** plaintiff demands injunctive relief, including but not limited to: (i) a judgment from this Court that defendant's actions were unlawful; (ii) compensatory damages in whatever amount she is found to be entitled; (iii) an award of costs and reasonable court fees; and (iv) punitive damages to the extent available; (v) pre-judgment and post-judgment interest; and (vi) a jury trial on all issues so triable, and for other relief deemed appropriate by this court.

## COMPLAINT FOR NEGLIGENCE

**163.**     Plaintiff Cory Lynn Abrams sues defendant LLUMC for negligence and alleges the following:

## JURISDICTION AND VENUE

**164.**     This Court has jurisdiction over this action pursuant to the California Tort Claims Act for allegations of negligence and Section 1714 of the California Code and Section 335.1 of

the California Code of Civil Procedure. Venue is proper as both the plaintiff and defendant reside or conduct business within San Bernadino County, California.

## PARTIES

**165.**   Plaintiff resided in Yucaipa, California, for all times material to this complaint, and designates the mailing address of 11511 Pendleton Road, Yucaipa, California to which all written communications can be delivered.

**166.**   Defendant is a California corporation and an employer doing business at the address of 11370 Anderson Street, Suite 3000 and 11234 Anderson Street in Loma Linda, California for all times material to this complaint.   Defendant's Senior Vice President for Risk Management is Mark Hubbard whose business address is 11234 Anderson Street in Loma Linda, California.

**167.**   Plaintiff did not become aware that she was able to state a cause of action for negligence against defendant until recently, or within the last few months of commencing this complaint against the defendant.

**168.**   Defendant has no immunity from this cause of action, or any immunity has been waived.

## PLAIN STATEMENT

**169.**   Defendant implemented a policy known as its "COVID policy" that had nothing to do with plaintiff's time as a patient with defendant. Despite this, defendant sought to impose experimental medical interventions upon plaintiff without any *bona fide* medical examination or diagnosis, medical necessity, legal authority or legal duty. Defendant claimed that the policy was intended to prevent the spread of what it believed to be a "deadly contagious disease" known as "COVID-19"; however, defendant never had any means of measuring or determining whether or not its policy was effective. Additionally, the policy sought to circumvent plaintiff's medical privacy rights and rights to informed consent, while also imposing experimental medical treatments administered by laymen and without the supervision of any qualified physician, and without any *bona fide* medical diagnosis, and without any judicial oversight or approval.

**170.**   As a direct and proximate cause of defendant's negligent policy and the manner in which the employees of defendant imposed it upon the plaintiff, she suffered substantial financial losses and severe adverse health consequences which continue to this day.

## STATEMENTS OF FACT

**171.**   Defendant was a public accommodation from which plaintiff sought medical assistance for the birth and delivery of her child, beginning on the date of March 22nd, 2021.

**172.**   Plaintiff re-alleges her allegations from Counts I and II in the foregoing complaint and makes the following additional allegations.

### ALLEGATIONS

**173.**   Plaintiff re-alleges the foregoing statements of fact from Counts I and Counts II and incorporates each fact herein and further alleges as follows.

**174.**   There was never any "mandate" because it was not only negligent, it never created any new legal duty for anyone to comply, nor any new legal authority for anyone, except the Department of Health ("DOH"), to impose any experimental medical treatments on anyone.

**175.**   Defendant's "COVID policy" was negligent because it was based upon the ludicrous premise that "one person needs to undertake a medical treatment in order to prevent illness in another person". If this were true, then the population of people on Earth and possibly all mammalian life would have become extinct thousands of years ago. If a medical treatment is effective, then one person could take it and be treated or cured. The "mandate" admits on its face, by its very existence, that the medical treatments are not effective in any way whatsoever.

**176.**   Again, the "mandate" created no legal duty or authority and not was legally binding upon anyone. The "mandate" is no more binding upon anyone than would be a movie script would be binding upon extras near a movie set.  At the very least, the "mandate" failed to consider those with disabilities and failed to comply with the ADA and in fact, facilitated discrimination and retaliation by all those employers gullible enough to participate as if the "mandate" were anything more than a movie script.

**177.**    If two people are required to make a medical treatment effective, then it is not effective, at all. Especially for employees of the defendant who are doctors and nurses and generally scientists, they each have a greater expectation of knowledge by their professional and educational backgrounds.

**178.**    On July 12, 2021, hospital manager David Philips gave plaintiff a printed copy of the CDPH mandate and claimed that this was the "COVID policy" of the hospital.  A true and correct copy of the mandate is included as Exhibit A-2 with the affidavit filed in support of this complaint and as Exhibit B-4. The mandate did not state that patients were to be refused medical services if they declined to wear a mask and the document also recognized that some people should not wear masks.

**179.**    Defendant adopted a policy known as its "COVID policy", which was published on its website at this page. The most updated version is listed at this site, but plaintiff has alleged the specifics of the policy she encountered at the time of her treatments: https://lluh.org/patients-visitors/health-wellness/coronavirus-information-and-updates/covid-19-safety-prevention. It is likely that by the time this allegation is discovered by defendant, it will have attempted to remove such pages from its website. The July 12, 2023 version from its website is included with this complaint and alleged herein at Exhibit B-1 and B-2.

**180.**    Plaintiff alleges each and every provision of this policy and incorporates each said provision into this complaint.

**181.**    Plaintiff requests that this court take judicial notice of every aspect and term of the State of California's "COVID policy", including Exhibit A-2 and Exhibit B, and every revision of the policy and the state's current "COVID policy" now published at www.cdph.ca.gov. Two true and correct copies of the CDPH mask guidance, including that for hospitals, ranging from June 18, 2020 through June 24, 2021 is included in Exhibit B.

**182.**    The adoption and implementation of defendant's "COVID policy" was negligent.

**183.**    Defendant claimed that its policy was able to "prevent the spread of COVID-19". This claim contradicts every authority in the health care industry and is based upon the false promise that defendant suddenly acquired the ability to treat or prevent the infection or

transmission of a "deadly contagious disease", when every other expert in the world admitted that it could not. This is not only delusional, but negligent.

**184.** The following statement is on the defendant's website under the FAQ section about "Covid vaccines" "Though you can still get COVID-19 after getting vaccinated, all vaccines have been shown to be highly effective at protecting you from hospitalization or death from COVID-19. Most people are also protected from serious illness after getting vaccinated, usually several weeks after completing their primary vaccination series.  You may still be able to transmit COVID-19 to other people even after you've developed immunity. It's still important to use a mask and practice social distancing after vaccination."  This published statement shows that the defendant is aware that the "COVID vaccines" do not confer immunity on the user or prevent transmission, it may only lessen the severity of symptoms for the user.  A true and correct copy of this statement is included in Exhibit B-5.

**185.** The Defendant's "COVID policy" in Exhibit B admits that defendant sought to impose non-required medical treatments, that is, mask-wearing during an EUA period, without any medical diagnosis or informed consent. The fact that the policy requires everyone to wear masks in order for someone else's mask to work demonstrates that the treatment does not prevent infection or transmission. This "required" medical treatment has no medical efficacy to prevent infection or transmission of "COVID-19", even if there were evidence that such a disease did exist.

**186.** Defendant's policy was also negligent because the very provisions of the policy demonstrate that not one provision or medical treatment it imposed on all patients and visitors was actually expected to prevent, treat or cure any illness, especially the "COVID-19" disease. The stated purpose for the policy was to "prevent the spread of COVID-19", but the treatments stated in the policy admittedly did not prevent the spread of "COVID-19".

**187.** Defendant owed plaintiff the duty of complying with, or upholding plaintiff's medical privacy rights and rights to informed consent.

**188.** Defendant owed plaintiff the duties normally associated with public accommodations, such as hospitals.

**189.**    The "COVID policy" is based upon the implausible speculation and hypothetical belief that every patient of the defendant, including the plaintiff, suddenly presented a threat of either being infected, or would soon become infected, with the same exact disease and that this disease is a deadly, contagious disease. This policy is based upon the unproven beliefs that viruses are contagious pathogens and that "COVID-19" is a deadly contagious pathogen, and that every patient, or every person in the country suddenly became infected with such disease, or would imminently become infected.

**190.**    The policy is also based upon the pure speculation and hypothetical belief that defendant suddenly acquired the legal authority and the legal duty to impose such experimental medical treatments upon its patients and visitors, including plaintiff, as a new condition of receiving the services of the defendant, even when the plaintiff did not consent to these treatments.

**191.**    The policy is also based upon the purely speculative and hypothetical belief that defendant suddenly obtained the legal right and the legal duty to violate every patient's or invitee's rights to medical privacy and informed consent without any judicial oversight or approval.

**192.**    The policy is also based upon the purely speculative and hypothetical belief that the defendant suddenly acquired the professional competence and qualifications to determine that these medical treatments and other procedures were medically necessary without a diagnosis of such condition or the supervision of any *bona fide* and licensed physician.

**193.**    Defendant owed plaintiff the duty of fulfilling its professional obligations where defendant's "COVID policy" was not relevant to the care sought by plaintiff,  that is, the birth of her child.

**194.**    Defendant claims that its "COVID policy" was intended to "prevent the spread of COVID-19"; however, defendant had no reliable means of measuring or determining when and where anyone became infected with such a disease, or if anyone had become infected with such a disease, and it had no means of excluding other factors not related to defendant's "COVID policy" that may have contributed to any such infection. At no time was any patient or invitee in a controlled environment that would have enabled defendant to conclusively establish the proximate cause of anyone becoming infected with the "COVID-

19" disease. Defendant and its "COVID policy", had no way of determining the proximate cause of anyone becoming infected with such a disease and it cannot therefore, legitimately "prevent the spread of COVID-19", despite making such claims, even if such a disease did exist. For this reason alone, defendant's policy was not only foolish and ignorant, but negligent.

**195.** Defendant's policy was also negligent because the very provisions of the policy demonstrate that not one provision or medical treatment it imposed on all patients and visitors was actually expected to prevent, treat or cure any illness, especially the "COVID-19" disease. The stated purpose for the policy was to "prevent the spread of COVID-19", but the treatments stated in the policy admittedly did not prevent the spread of "COVID-19".

**196.** Furthermore, defendant's "COVID policy" was premised on the notion that it was necessary that everyone undertake the treatments in order to prevent illness in another patient. If this presumption were true, this would actually establish that the treatment has zero medical efficacy.

**197.** The policy is premised upon the ludicrous idea that its treatments and procedures required at least two people to participate in order to be effective; this is clearly set forth in the policy which stated that it applied to everyone, (employees, patients, visitors,  all invitees) because defendant's policy deemed everyone presented a risk of infection. There has never been any scientific proof, at any time in human history, that in order for a medical treatment to be effective, one person has to undergo the treatment in order to prevent the illness in another person. There is absolutely no science, anywhere in the world, demonstrating that two people are required in order for a medical treatment to be effective.

**198.** Furthermore, defendant's negligent policy is also based on the foolish idea that even if someone participated in it, he would need to continue participating in it, even after treatment, and even if everyone around him had already been treated. This has to be the most idiotic medical treatment plan in all of human history, and therefore, it is negligent.

**199.** Defendant owed a duty to plaintiff to comply with both state and federal laws, especially for hospitals. Defendant breached one or more of its duties to plaintiff as more fully set forth and alleged herein.

**200.**   The state's public health policy,[3] especially involving contagious diseases and deadly contagious diseases that lead to epidemics and pandemics, including but not limited to those involving respiratory illness, requires judicial oversight upon petition to the court which can only be made by the DOH, and such petition must be based upon a physician's *bona fide* diagnosis and affidavit that the specific individual is an imminent threat to himself or others. The court may then promulgate an order imposing certain medical interventions upon the specific individual, following an evidentiary hearing that determined he posed an imminent threat to himself or others. This is an actual "mandate", a legal duty, to which only the DOH is subject and to which only the DOH can avail itself. This legal authority, and this legal duty, cannot be delegated and certainly, the defendant had no such legal duty nor legal authority to impose, not only medical treatments, but involuntary and experimental medical treatments during an EUA period.

**201.**   In fact, it was this very conduct by the Nazis in Germany that resulted in the Nuremberg Code,[4] a body of medical and ethical standards prohibiting any nation from imposing medical treatments on its population in violation of medical privacy and rights to informed consent.  The Nuremberg Code eventually found its way into the federal laws of the United States and the Food and Drug Administration ("FDA") has memorialized in every state's public health policy the concepts known as "rights to informed consent", "right to refuse medical experiments" and "right to medical privacy".

**202.**   Defendant deliberately provided plaintiff with false information, claiming that there was some law requiring her compliance with its "COVID policy", specifically, defendant cited Health & Safety Code 120175. This citation is false because its fails to identify the existence of any contagious disease as required by Code 120215 and defendant failed to obtain any *bona fide* health order from an actual court based upon actual evidence as required by the sections referenced in footnote 3.

**203.**   These regulations create no new legal duty nor legal authority for defendant's policy. This regulation depends solely upon voluntary participation because, assuming it is legally binding at all, it fails to include any provision requiring anyone to actually disclose his medical records so that compliance could be verified. Assuming that the regulation is legally

3 Health & Safety Code, Sections 121365 & 121367
4 *United States of America v. Karl Brandt*, Military Tribunal I, est. on 25 October 1946 under General Orders No. 68 issued by command of the United States Military Government for Germany.

binding upon its face, it fails to include any provision requiring anyone, including plaintiff, to disclose her medical history or vital statistics, so there is no possible way to impose the regulation upon anyone who chooses to exercise her medical privacy rights.

**204.** It is quite obvious that if defendant had the authority to compel plaintiff's disclosure of her medical records and vital statistics, then defendant could have simply requested these records from plaintiff's physician and avoided all of the drama. Instead, defendant's policy was negligently based upon coercing and intimidating plaintiff to waive her medical privacy rights, and/or penalize her for exercising these rights, by the manner in which it was imposed upon her by defendant.

**205.** Defendant's refusal to treat plaintiff unless she first submitted to an unrelated medical treatment, without any diagnosis and without her consent, was directly and proximately caused by defendant's implementation of its "COVID policy" that sought to involuntarily and negligently impose experimental medical treatments upon the plaintiff.

**206.** Defendant's "COVID policy" sought to impose unrelated medical treatments upon plaintiff for an undiagnosed condition such that plaintiff was required to submit to such contraindicated medical treatments or be denied the medical treatment for which there had already been given a *bona fide* medical diagnosis of *Hyperemesis Gravidarum* (severe nausea and vomiting during pregnancy) which precluded plaintiff from wearing a mask. Furthermore, on July 30, 2021, plaintiff had a phone call with Dr. Barlow, who acknowledged that plaintiff's heart condition could also cause her to feel shortness of breath, which was an additional medical reason she was unable to wear a mask. (See *Aff*. ¶ 13, 14, 26)

**207.** Defendant's policy never identified any "mask" or "test" that was not classified as an experimental medical treatment or that was outside the FDA's EUA period; which means they are classified as a clinical trial or epidemiological experiment.

**208.** Defendant's "COVID policy" was not based upon any *bona fide* medical diagnosis of plaintiff, nor did it include any legal duty for plaintiff to disclose her medical records for the treatments which were unrelated to her pregnancy and delivery.

**209.**    Likewise, defendant's "COVID policy" was not based upon any new legal authority giving defendant the legal right to impose any provision of its "COVID policy" upon plaintiff as a condition for her to receive her necessary medical treatment.

**210.**    Plaintiff directed defendant to obtain any needed medical records from plaintiff's physician but defendant failed to request or obtain such medical records because of plaintiff's medical privacy rights. Defendant's "COVID policy" sought to require plaintiff to waive these rights by asking for her medical records directly, instead of requesting them from her physician. The fact that defendant failed to, and would not have been able to obtain such records from plaintiff's physician due to her medical privacy rights, establishes that defendant's policy did not overcome or constitute any waiver of plaintiff's medical privacy rights with any new legal duty or any new legal authority.

**211.**    These new conditions, in defendant's "COVID policy", were not subject to any supervision by a competent or qualified medical professional, such as a physician; the new conditions failed to consider or provide protections for plaintiff rights to medical privacy or informed consent; and were not the result of any new legal duty or legal authority or court order, or court order obtained by the DOH.

**212.**    All material acts and conduct took place upon the premises of defendant at the location alleged, the date alleged and at the approximate time alleged.

**213.**    Plaintiff did not contribute to defendant's acts or conduct giving rise to this complaint.

**214.**    Plaintiff suffered injury as a direct and proximate consequence of defendant's actions or conduct that, at the very least fell below its standard of care as a direct and proximate cause of defendant implementing its "COVID policy". These material facts and events took place between the dates of March 22, 2021 and January 15, 2022.

**215.**    Defendant and its employees were in control of the premises and solely responsible for the condition of the premises and the conduct alleged, for all times material to this complaint.

**216.**    In fact, defendant adopted a policy that deliberately violated its duty of care by any reasonable standard, as more fully alleged herein, including but not limited to those described by the following allegations. Defendant's "COVID policy" was unsafe and involved

imposing involuntary and experimental medical treatments that admittedly had no medical efficacy (because it relied upon one person being treated in order to prevent illness in another).

**217.**    Plaintiff alleges each and every provision and revision of defendant's "COVID policy" and summarizes the material provisions by the following:

**218.**    Defendant's "COVID policy" purportedly required plaintiff to submit to a medical treatment known as "wearing a face mask to prevent the spread of COVID-19", despite the fact that plaintiff had never been diagnosed with such a condition, nor was she seeking treatment for such a condition, in fact, plaintiff was seeking pre-natal care and delivery care for her pregnant state while managing her diagnosed heart condition and the *Hyperemesis Gravidarum* (severe nausea and vomiting during pregnancy) she was experiencing. (See *Aff*. ¶ 13, 14, 26)

**219.**    Defendant's manager David Philips denied plaintiff access to medical services despite the fact that plaintiff claimed a medical reason that wearing a mask was contraindicated for her actual condition; instead David Philips insisted on treating plaintiff for a hypothetical condition that she had not been diagnosed with. (See *Aff*. ¶¶ 18-20)

**220.**    Defendant's "COVID policy" purportedly also required plaintiff to submit to medical examinations known as "temperature taking", "COVID-19 screening", and treatements such as isolation whether or not such testing and the examination results were obtained or reviewed by any licensed physician, or with the consent of the plaintiff. (See *Aff*. ¶¶ 17, 28, 35-37)

**221.**    Defendant's "COVID policy" purportedly also required plaintiff to submit to medical examinations known as "COVID testing" as a new condition of receiving her scheduled C-section. Defendant first told plaintiff that if she refused the "COVID test" that she would be isolated and her husband would not be allowed to attend the birth, and when plaintiff complained of being forced to accept medical procedures and medical devices that were unneeded for her C-section, defendant cancelled her C-section entirely, on September 24, 2021, one month before her delivery. (See *Aff*. ¶¶ 23, 28, 29, 33)

**222.**    On October 22, 2021, plaintiff began experiencing birth contractions and came to the defendant for delivery because she was in labor. (See *Aff*. ¶ 36)

**223.**    The front desk check-in staff called security, instead of her doctor, when plaintiff declined to be treated with a mask.

**224.**    A rapid response team was called and plaintiff overheard them discussing sending plaintiff away to find an ER facility for her birth because plaintiff was declining a mask. The rapid response team were more concerned with trying to treat plaintiff for an undiagnosed condition rather than treat her for her for being currently in labor and her known pregnancy complications. (See *Aff*. ¶¶ 36, 37)

**225.**    Defendant's Charge Nurse called the sheriff on plaintiff's husband and had him removed from the premises by making a false accusation that he was "threatening her" despite the fact that the Charge Nurse was the one yelling and harassing both the plaintiff and her patient advocate/husband/father of her child for not wearing mask. (See *Aff*. ¶¶ 38-39)

**226.**    Defendant removed plaintiff's husband from the premises and told him he was "permanently banned" from the hospital. (*Id.*)

**227.**    Defendant's "COVID policy" imposed terms of segregation, isolation and quarantine on the plaintiff without any judicial oversight.

**228.**    Defendant isolated the plaintiff despite there being no evidence that she was a direct threat of contagion. (See *Aff*. ¶¶ 41-42)

**229.**    Defendant's "COVID policy" purportedly required plaintiff to wear a surgical mask over her airways while in labor and while vomiting and failed to disclose that this involved the application of a medical device according to the FDA.

**230.**    Plaintiff continued to vomit during her epidural and C-section. (See *Aff*. ¶ 40)

**231.**    Defendant's "COVID policy" purportedly also required her to take "COVID tests" because she was not "COVID vaccinated" but it failed to disclose the fact that there were no FDA-approved and commercially available vaccines.

**232.** There were only FDA-authorized, emergency-use "injections' which specifically  did not claim to prevent either infection or transmission, and which had not completed trial phrase testing particulary for use by pregnant mothers.

**233.** Defendant's "COVID policy" purportedly required plaintiff to disclose her medical records to complete laymen with no medical training or expertise.  Defendant referred to such invasion of medical privacy as requesting plaintiff's "vaccine status", taking her temperature and/or asking for the "results" of  "COVID tests".  (Aff ¶17, 18,

**234.** Instead of requesting the plaintiff's medical records from the plaintiff's physician, aware that the plaintiff's physician would correctly refuse such a request without the express written consent of the plaintiff, defendant circumvented or attempted to circumvent medical privacy by coercing the plaintiff to waive her medical privacy rights in order to implement its ridiculous "COVID policy" directly upon the plaintiff, and in the manner more fully described in this complaint.

**235.** Defendant's "COVID policy" failed to include any notice that its provisions were implemented during an official EUA period and that any medical treatments were experimental and not approved by the FDA.

**236.** Defendant's "COVID policy" failed to include any provision for those with disabilities.

**237.** Defendant's "COVID policy" failed to consider or recognize any invitees with contra-indications to any provision of the policy despite being advised to do so. (Aff ¶ 17, 20, 25, 26, 28-30, 32-33, 35-36)

**238.** Defendant's "COVID policy" failed to include any provision for those with contra-indications to any of its medical treatments. In fact, plaintiff fully expressed that she had contra-indications but this was denied or ignored by defendant altogether. (Aff ¶ 17, 20, 25, 26, 28-30, 32-33, 35-36)

**239.** The policy set forth conditions for compliance and consequences or penalties for non-compliance, along with time periods by which invitees were required to comply or suffer the penalties, which included but were not limited to isolation, segregation, denial of services and denial of medical treatments.

**240.** Further retaliations included defendant's Charge Nurse  calling the sheriff on plaintiff's husband by falsely claiming he was physically threatening her and then arranging, with the sheriff, to make a false police report for "trespass" despite having no evidence of this violation. This resulted in plaintiff's husband James being removed from the hospital while plaintiff was in labor as alleged in the affidavit.

**241.** Defendant again retaliated against plaintiff by taking an unauthorized "emergency" drug test on herself and her infant daughter, reporting plaintiff to Child Protection Services, threatening to have her child taken away, and falsely accusing her of abusing drugs and failure to properly care for her daughter as alleged in the affidavit.

**242.** The policy failed to include any meaningful or impartial oversight or dispute resolution or grievance procedure, or if it appears that there was such a procedure, defendant refused to abide by the procedure,  in good faith as alleged in the affidavit.

**243.** At no time did defendant attempt to obtain the consultation of any licensed health care professional regarding any one invitee, specifically the plaintiff, and the implementation of its "COVID policy".

**244.** At no time did the defendant even attempt to obtain additional insurance to accept financial responsibility for protecting its invitees, including plaintiff, from the "spread of COVID-19".

**245.** At no time did defendant even attempt to obtain additional insurance to accept financial responsibility for any invitee, including plaintiff, suffering any adverse health consequences as a result of participating in or complying with its "COVID policy".

**246.** Defendant acted upon the unfounded presumption that first, there was such a deadly contagious disease; second, that every invitee suddenly was a direct threat of it, and thirdly that defendant had a duty to "treat" everyone for it and thereby adopted its "COVID policy" in the most negligent manner as plaintiff describes herein.

**247.** Furthermore, at no time did defendant ever attempt to verify with the local department of health, the CDPH or the DOH, whether or not such deadly contagious disease was either proven to exist or proven to be contagious. To this day, there is absolutely no evidence of either.

- 35 -

**248.**     At no time did defendant rely upon any court orders obtained from the DOH that determined any of its invitees, specifically the plaintiff, objectively have such a disease.

**249.**     Moreover, while the government proclaimed a public health emergency, there was never any evidence of such an emergency, and the respondent never obtained probable cause to legally impose any provisions of its negligent and *ad hoc* "COVID policy".

**250.**     The CDPH admits that it has no documentary or scientific evidence (any culture or specimen) of any *bona fide* "COVID-19" contagious disease.   It is a scientific fact that viruses are not contagious pathogens in the first place. Even with a histological or excretory specimen from any individual, there is no way to obtain valid test results establishing that the individual has or does not have any such disease as "COVID-19" for the simple reason that there is no sample by which the specimen can be compared. This demonstrates that there is no evidence of any public health emergency, merely a naked proclamation based upon pure speculation.

**251.**     The official records of the medical examiner's office reveal that there was absolutely no cognizable change in either the morbidity or mortality rates for the year 2020; however, we can notice a significant increase in these rates following the practice of administering or unlawfully compelling people to take the experimental "vaccines" which have caused stroke, heart failure, neurological disorders, blood tissue clotting and related disorders, organ failure, miscarriages, sterility and death. These were not the direct and proximate result of the "virus" but of the experimental medical treatments. This demonstrates that there is no evidence of any public health emergency, merely a naked proclamation based upon pure speculation.

**252.**     The CDPH did not receive one verifiable affidavit from any physician reporting any *bona fide* diagnosis of any certain individual having contracted "COVID-19". These are public records and can easily be verified but instead, everyone just accepts the fake news and what government officials blurt out in the news without any scrutiny.

**253.**     This demonstrates that there is no evidence of any public health emergency, merely a naked proclamation based upon pure speculation from those making these false claims (the government, the mayor, the governor, defendant, the CDC, employers etc.) which are

all participating in disaster fraud, as they are rewarded by money from the disaster relief funds.

**254.** At no time did the CDPH file any petition to obtain any detention order from the court. Failing to apply for a detention order denies anyone who is adversely affected by the "COVID policy" the right to a be heard. If there was such a disease and if someone had been diagnosed with it, the CDPH failed to fulfill its legal duty under the law. This demonstrates that there is no evidence of any public health emergency, but merely a naked proclamation based upon pure speculation. The fact that no such records exist again establishes that there is no evidence of any public health emergency.

**255.** Once again, we revisit the official public records of the CDPH and discover that it has absolutely no documentary or scientific evidence, first of all that viruses are contagious pathogens, but more importantly, no evidence of the existence of the *ad hoc* "SarsCov2" or "COVID-19", whereby, no such specimen or culture has ever been isolated, purified and visualized by long-standing scientific standards. Once again, there is no evidence of any such public health emergency.

**256.** No single death certificate (public record) ever identified the "COVID-19" as the single and certain cause of death; however, including the term in the actual certificate as a possible contributing cause ("co-morbidity") awarded the coroners and physicians huge sums of money. Once again, there is no evidence of any such public health emergency.

**257.** The announcement of public health emergency did not create any new legal authority or any new legal duty. Even if there were such an epidemic or pandemic, and even if the respondent's claim were proven to be true and correct, this fact alone did not suddenly give anyone, especially the defendant, any new legal authority, nor any new legal duty of care to compel laymen to impose the same exact medical treatment on everyone at the same time and without any diagnosis of any single individual, and without any judicial oversight or approval based upon a medical diagnosis that any one or more specific individuals within the "group", the entire city, had any such contagious disease.

**258.** There is no need to cite the pertinent laws and regulations because they are all compiled in the California State Public Health Legal Manual as previously cited.

**259.**    Even if there were any single fiber of evidence that such a public health emergency did exist, the defendant did not thereby obtain any new legal authority, nor any new legal duty to act in the manner expressed in its related policies. Likewise, just because someone declared a public health emergency, even if it were true, this alone does not give anyone any new legal authority or legal duty to violate the medical privacy rights of people in the community nor does it constitute any waiver of such rights.

**260.**    Specifically, Health & Safety Code, Sections 121365 & 121367 sets forth the actual legal duties of physicians (not hospitals) and the local health officer, the summary of which includes: upon receiving an affidavit from a licensed physician that reports a specific individual as having a deadly contagious disease, or that he has been exposed to a toxic substance, the local health officer, if unable to obtain the cooperation of the individual, can apply to the superior court for an order imposing certain medical treatments upon the individual and also imposing quarantine or isolation measures, but only under certain conditions and for only a limited time.

**261.**    If then, by competent evidence following a *bona fide* evidentiary hearing, the individual is proven to be a direct threat to himself or others, the court may order such measures to be imposed upon him.  There has never been any cognizable authority for the CDC, a mayor, or anyone from within the executive branch of government, to act as if everyone in the community had the same exact illness and then impose medical treatments upon everyone simultaneously, including forced medical examinations and compelling everyone to disclose his medical records for the purpose of policing such illegal policies. There is absolutely no authority conferred upon the defendant to engage in this conduct itself. The duties of the CDPH cannot be delegated and were never delegated or assigned to the defendant.

**262.**    There is no authority anywhere that permits defendant to act upon the declaration that there is a public health emergency, such as a deadly contagious disease, by imposing experimental medical treatments and examinations upon everyone simultaneously without any evidence or diagnosis or due process. This is clearly negligent.

**263.**    At no time did defendant make any meaningful effort to refrain from implementing its "COVID policy", specifically upon receiving notice from the plaintiff that its policy was not

related or necessary for any of plaintiff's medical needs, was actually contraindicated by her medical history, did not fulfill any "business necessity" as defined by the ADA, and was not required by any law or court order, and was not based upon any *bona fide* medical diagnosis or risk of any kind.

**264.** At no time did defendant attempt to verify the existence of any pandemic or epidemic; however, even if such condition did exist, it did not create any new legal duty for defendant to impose its "COVID policy", nor did it create any new legal authority, nor did it waive the medical privacy rights, or the rights to informed consent, of plaintiff or any employee, invitee or patient.

**265.** Defendant imposed unlawful and hazardous conditions upon plaintiff for the use of its facilities. These unlawful conditions include, but are not limited to, imposing experimental medical interventions negligently administered by laymen, without any legal authority or duty, and without any physician's supervision and in violation of plaintiff's rights to medical privacy and informed consent and in direct contradiction to plaintiff's actual medical conditions. Even though many defendant's employees may have been doctors and nurses, those seeking to impose the "COVID policy" upon plaintiff were not the doctors and nurses of plaintiff, and therefore, are laymen in their relation to plaintiff.

**266.** Defendant imposed unlawful and hazardous conditions upon plaintiff for the use of the facilities. These unlawful conditions also include but are not limited to, willfully imposing experimental medical treatments and tests on the plaintiff, whereby they were administered and imposed upon plaintiff by laymen with no accountability or financial responsibility of any kind.

**267.** Defendant's "COVID policy" was purely speculative, irrational and unreasonable because it was based upon the outrageous and illogical notion that in order to prevent illness in one person, that another person needs to undertake the medical treatment. This ridiculous notion has never existed at any time in human history, has never proven to have any medical necessity or efficacy, is not and never has been taught in medical school, and is pure quackery and, in this case, negligent.

**268.** While defendant's "COVID policy" created no new legal duty of care, this policy violated defendant's long-standing legal duties of care as alleged herein. Specifically,

defendant violated its duty of care to provide a safe environment for providing services by subjecting patients, visitors and invitees, such as the plaintiff, to experimental medical interventions.

**269.**    Further, defendant was acting outside of the scope of its charter which does not include implementing practices reserved only to the DOH under the supervision of the court.

**270.**    Further, defendant failed to prevent, intervene or meaningfully respond in matters involving patient's written claims detailing her harassment, denial of rights, and denial of services as expressed in the foregoing allegations and plaintiff's affidavit[5].

**271.**    Defendant's "COVID policy" provoked and instigated conflict and confrontation between defendant and plaintiff and between plaintiff and other personnel working on the premises as alleged in the affidavit.

**272.**    Defendant's "COVID policy" created a poor and unsafe environment, not only for plaintiff but for others with whom plaintiff needed to coordinate to complete necessary tasks in the medical care she was seeking. Some examples detailed in the affidavit include: the desk staff called security on plaintiff when she came for appointments; the manager called the Sheriff to remove plaintiff and her husband from the premises; the Charging Nurse called the sheriff to remove plaintiff's husband from the premises which left her without a patient advocate; the charging nurse yelled at her when she was in labor; plaintiff was not allowed to received any visitors besides her mother; plaintiff was forced to be isolated from her husband and patient advocate during the birth; and the operating staff threatened to have her baby taken away and called child protective services on the plaintiff. (See *Aff.* ¶¶ 12, 13, 19, 20, 35, 37-39, 42, 44, 46)

**273.**    The defendant had actual or constructive knowledge of the dangerous condition and should have taken action to remedy it. Especially considering the fact that defendant was a hospital with doctors, nurses and other professionals who are expected to have a greater level of education regarding health, medicine, medical practices and public health law; and yet, it proceeded to participate and implement the negligent policy without care or consideration or taking any efforts to scrutinize the necessity or effectiveness of the policy, even though it was written by unknown people. Since when would any physician accept the

---

5    Plaintiff both called and wrote numerous letters to the defendant to resolve the issues.  These are noted in the Affidavit and attached exhibits.  See Affidavit entries 21-34.

prescription of another physician without conducting his own diagnosis? Since when would
or should any physician or health care professional impose a medical treatment that was
written, not by another physician, but not a group of unknown people working for a
corporation?

**274.**    The defendant should not have imposed any provision of its "COVID policy", at least
for the following reasons:

**a)**    Defendant's policy denied plaintiff any opportunity for informed consent.

**b)**    Defendant's policy denied plaintiff's attempts to have meaningful debate or
discussion on any of its provisions with defendant or how these provisions may adversely
affect plaintiff.

**c)**    Defendant's policy violated plaintiff's rights to medical privacy.

**d)**    Defendant's policy was not implemented because of any new law or any court order
obtained by the CDPH.

**e)**    Defendant's policy was not based upon any *bona fide* medical examination by a
physician that justified the medical necessity of the intervention.

**f)**    Defendant failed to obtain or establish any medical efficacy for the interventions.

**g)**    No provision of defendant's "COVID policy" advised or disclosed to plaintiff the
nature or possibility of any hazard or risk associated with any of the treatments,
interventions or experimental treatments.

**h)**    Defendant's "COVID policy" was hazardous and unsafe and not rooted or founded
upon any scientific standards or *bona fide* medical advice pertaining to any single invitee,
employee or individual, including but not limited to plaintiff.

**i)**    Defendant's "COVID policy" was not based upon, and failed to describe, any
"business necessity"[6] for which the policy was needed; and, failed to describe any legitimate
"business necessity" for which the policy was needed.

**j)**    Defendant's "COVID policy", and defendant generally, had no possible means to
measure or test whether or not it did in fact "prevent the spread of COVID-19" as defendant
claimed it was intended.

6    As defined in the ADA statutes and requiring an objective risk assessment and analysis.

**k)**    Defendant's implementation of its "COVID policy" created the dangerous condition involving the involuntary imposition of experimental medical treatments without any judicial oversight or approval, without any physician's oversight, without any financial responsibility and in violation of plaintiff's medical privacy rights and rights to informed consent.

**l)**    The policy was arbitrary, irrational and unreasonable because it was based purely upon some Hollywood-style "pandemic" movie such as "Outbreak", and the implausible scenario that every invitee, patient and employee suddenly had become infected with the same exact deadly contagious disease within the same time period and that it was so deadly that it could be treated by people with absolutely no medical training, and without any *bona fide* medical diagnosis.

**m)**    Defendant's "COVID policy" demonstrated that it had no medical efficacy because it was based upon everyone participating for it to be effective, and purportedly required everyone to continue participating even after treatment. This is the definition of a medical treatment having zero medical efficacy, yet the defendant proceeded to ignorantly and negligently impose it upon everyone including the plaintiff.

**n)**    Defendant's "COVID policy" was adopted and implemented by employees of the defendant who were each suffering from one or more un-diagnosed mental illnesses, such as those known as *factitious disorder*, and/or *narcissistic personality disorder* as each is defined in the Diagnostic and Statistical Manual for Mental Health, 5th Ed.[7]

**o)**    The defendant's policy was the cause of harm in fact. Plaintiff would not have suffered the alleged injuries, harms and damages "but-for" the policy.

**275.**    The defendant allowed employees with these un-diagnosed mental illnesses to administer and manage its "COVID policy".

**276.**    The defendant failed to undertake any measures to treat those employees suffering from these mental illnesses, or to discover obvious symptoms for the purpose of assigning treatment within a reasonable time.

**277.**    The defendant's policy neglects to consider the logical and rational question that, if there were such a deadly contagious disease, why would the defendant be permitted to involuntarily impose experimental medical treatments in the manner alleged? Which is more

7    See also Factitious Disorder Imposed upon Another, Munchausen Syndrome and Megalomania.

dangerous, an implausible contagious disease that suddenly infects over three hundred million people, or layman administering experimental medical treatments based upon the same speculation without any medical diagnosis, patient consent, professional oversight or financial responsibility? If it really did exist and if it were really so dangerous, why was the responsive policy so carelessly and negligently implemented?

**278.**    The core of the policy itself was copied from the CDC's website, which disclaims all accuracy and liability for the provisions of the policy.

**279.**    Just like shouting "fire" in a crowded theater, defendant's "COVID policy" instilled fear, anxiety and apprehension in everyone at its facility, such that every time anyone had a cough or a symptom of the common cold, he believed he was not only going to die a horrible death but that he would infect other people with the same demise, and that he would "kill grandma". This created a very hostile and antagonistic environment, especially between those who adopted the beliefs of the defendant and those who either did not, or did not agree with the defendant's policy.

**280.**    Defendant's "COVID policy" fails to address the screaming reality that neither defendant, nor any scientific principles known to mankind at this time in history, has the ability to establish the proximate cause behind anyone becoming infected with the fictitious "COVID-19" disease. Defendant's negligent "COVID policy" fails to address the very obvious situation where anyone, such as an employee ends his shift and leaves the premises and is free to roam about the town or travel to far away lands and engage with unknown and unidentifiable "risks" or "infected people", and then return to his job to begin the next shift. The same is true for visitors, patients and generally invitees, including the plaintiff. It is by this fact alone that the defendant, no matter what its policies, is utterly incapable to "prevent the spread of COVID-19", by any stretch of the imagination, even if such a risk did exist. How then is it reasonable or equitable to punish anyone, specifically the plaintiff, for refusing to participate in the policy?   The policy, even if based upon correct and actual scientific findings, is completely useless simply because the defendant cannot control anyone's environment every moment of the day, whether at work or away.

**281.**   This condition (i.e. "COVID policy") existed for such a length of time that the defendant did know and should have known of the negligent condition in which it began implementing in June of 2021 which continues to this day.

**282.**   The defendant created the condition of its own volition outside of any business necessity, legal duty, legal authority or even common sense, and it occurred with regularity and was therefore foreseeable.

**283.**   Defendant had a duty to keep its property reasonably safe and protect the plaintiff from dangers of which it should have been aware, and to warn the plaintiff of any concealed dangers which should have been known to the defendant; however, defendant had no legal duty of care to involuntarily impose medical treatments, or especially experimental medical treatments, in the manner alleged.

**284.**   As a direct and proximate cause of the defendant implementing its "COVID policy", the plaintiff suffered the financial loss in the amount of thirty-two hundred and fifty dollars ($3,250.00)  in costs beginning from September of 2021 and continuing to this day, along with pain, isolation, humiliation, defamation of plaintiff's good name, sub-par health care that threatened plaintiff and her baby, along with associated costs for interrupted medical care. As a direct and proximate cause of defendant implementing its "COVID policy", plaintiff suffered approximately not less than one million dollars ($1,000,000) in financial and compensatory losses.

**285.**   The plaintiff suffered damages including but not limited to physical pain, unnecessary medical expenses that could have otherwise been avoided, emotional damages and other economic and non-economic damages.

**286.**   The defendant failed to keep its property or premises in reasonably safe condition and to protect the plaintiff from dangers of which the defendant is or should have been aware; and failed to provide adequate notice or warning to the plaintiff of the likely adverse health affects that are consequential to any provision of its "COVID policy". In fact, the defendant refused to discuss any aspects of its "COVID policy" with the plaintiff, including but not limited to her requests for defendant's legal duty and authority to impose it upon her, the medical necessity and efficacy of the policy, and for any legal basis that permitted the defendant to violate her medical privacy rights and rights to informed consent.

**287.**    The defendant's "COVID policy" itself was a hazard and negligent.

**288.**    The defendant is thereby responsible for the result of its willful acts (i.e. its "COVID policy") and also for plaintiff's injuries occasioned and suffered by the plaintiff because of defendant's want of ordinary care or skill in the management of its property or person.

**289.**    The defendant's "COVID policy" is preempted by state law and contravenes long-standing public policy regarding the health of well-being of people in the community.  Public policy as it concerns health matters, and specifically *bona fide* or proven "epidemics" or "pandemics", requires a *bona fide* medical diagnosis by a physician's affidavit, and judicial oversight and approval upon actions of the DOH. This role cannot be delegated, nor was it ever delegated to any private business or other government agency, and specifically, it was never delegated to the defendant.  The power to impose vaccinations is reserved to the law making authority of the state, while subject to judicial oversight and approval, and even the state cannot involuntarily impose experimental medical treatments without evidence and judicial oversight and approval.

**290.**    The plaintiff has no other remedy at law against the defendant.

**291.**    The defendant's conduct continues to this day and is expected to continue without cessation into the future as it continues to irrevocably injure the plaintiff and other employees.

**292.**    To this day, the defendant believes that the false and unproven reports made in the news and by government agencies about the "COVID-19" somehow gave it the legal duty and legal authority to act in the negligent manner alleged herein. Defendant will parrot the false and unproven claim that the "COVID-19 pandemic" has killed millions of people, and then it will claim that the plaintiff is a "COVID-19 denier"; however, even if there were such a pandemic or even if there were such a disease, this is not a legal defense to negligence in this case, and the defendant's acts and conduct were still negligent and the defendant still violated its many duties of care, none of which included imposing involuntary and experimental medical treatments upon anyone, including the plaintiff, and especially in the manner described by the plaintiff in this complaint.

**293.**    It is thereby likely that the plaintiff would prevail on the merits of the complaint.

**294.**     Plaintiff gives notice that she intends to seek punitive damages.

**295.**     Plaintiff demands a jury trial.

**296.     WHEREFORE** plaintiff demands judgment against the defendant for actual and compensatory damages in an amount not less than one million dollars ($ 1,000,000) plus costs, attorney fees and other relief as this court deems appropriate.

DATED this 5th day of September, 2023.

Cory Lynn Abrams
Plaintiff in *propria persona*

UNITED
POSTAL SERVICE ®

9589 0710 5270 1228 6000 79

PRIORITY
MAIL

y date specified for domestic use.
and include $100 of insurance (restrictions apply
service included for domestic and many internati
on insurance.**
nationally, a customs declaration form is require
rtain items. For details regarding claims
est Mail Manual at http://pe.usps.com.
Mail Manual at http://pe.usps.com for availability and
nual at http://pe.usps.com for availability and

A BOX
AND INTERNATIONAL USE

CLERK, U.S. DISTRICT COURT
RECEIVED

SEP 15 2023

CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION
BY DEPUTY

Retail

RDC 01

U.S. POSTAGE PAID
PM
YUCAIPA, CA 92399
SEP 14, 2023

92501

$19.35
R2305M147896-20

FROM:
Cory Lynn ABrams
11511 Pendleton Rd.
Yucaipa, CA 92399

TO:
Clerk of Court
George Brown Courthouse
3470 Twelfth St.
Riverside, CA
92501 - 3801